**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
KELVIN ABRAHAM LAO,

                                Plaintiff,

          -against-

CAROLYN W. COLVIN, the Acting Commissioner of Social
Security,

                                Defendant.
------------------------------------------------------------------X

FILED
CLERK
5/23/2016 12:09 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

MEMORANDUM OF
DECISION & ORDER
14-CV-7507(ADS)

**The Law Offices of Harry Binder and Charles Binder, P.C.**
*Attorneys for the Plaintiff*
60 East 42nd Street, Suite 520
New York, NY 10165
          By: Charles E. Binder, Esq., Of Counsel

**The United States Attorneys' Office, E.D.N.Y.**
*Attorneys for the Commissioner*
271 Cadman Plaza East
Brooklyn, NY 11201
          By: Candace Scott Appleton, Assistant U.S. Attorney
          By: Karen T. Callahan, Assistant U.S. Attorney

**SPATT, DISTRICT JUDGE**

The Plaintiff Kelvin Abraham Lao (the "Plaintiff") brings this action pursuant to 42 U.S.C. §

405(g) for review of the final decision of Carolyn W. Colvin, the Acting Commissioner of the Social

Security Administration (the "Commissioner"), finding that the Plaintiff is not entitled to disability

insurance benefits under Title II of the Social Security Act (the "Act"). Presently before the Court are

cross-motions by the parties for a judgment on the pleadings pursuant to Federal Rule Civil Procedure

("Fed. R. Civ. P.") 12(c).

For the reasons set forth below, the Court grants the motion by the Commissioner and denies

the motion by the Plaintiff.

# I. BACKGROUND

## A. The Plaintiff's Background

The Plaintiff is currently fifty-six years old and resides in Shirley, New York, with his wife. (SSA Rec. at 285.) He is a high school graduate. (Id. at 309.)

From June 1984 to August 2002, the Plaintiff worked at Merrill Lynch as a senior date entry specialist. (Id. at 309.) In a form accompanying his application for disability, the Plaintiff described the work as entailing walking and standing for two hours per day; sitting for ten hours per day; stooping for two hours per day; kneeling and crouching for 1 hour per day; writing and handling small objects for twelve hours per day; and frequently lifting objects which weighed at most ten pounds. (Id. at 339.)

In August 2002, he left Merrill Lynch because he found it stressful working with different computer programmers. (Id. at 127.)

From September 2002 to December 2002, he worked as a shipping and receiving clerk for the Triangle Building Company, a building products company. (Id. at 127, 309.) For the Triangle Building Company, his job entailed counting and helping to process building material. (Id. at 127.)

From July 2003 to January 2004, he worked as an assistant for the Wave Cooling and Heating Company installing air conduction units, work that he described as requiring "a lot of climbing and lifting[] heavy material." (Id. at 127–28.)

From April 2004 to November 2010, the Plaintiff worked as a general manager at Aid Auto Store. (Id. at 128.) In that role, he worked in the parts department and helped customers get the items they needed and occasionally filled in for other employees at the cash register. (Id. at 128–29.) On November 30, 2010, the Plaintiff was laid off from his job because the store went out of business. (Id. at 162.)

**B. The Plaintiff's Testimony**

As described in more detail below, on June 6, 2012 and November 21, 2013, respectively, the Plaintiff testified before Administrative Law Judge Bruce MacDougall (the "ALJ").

The Plaintiff testified that he began experiencing symptoms related to a heart condition and high blood pressure in May 2011, when he went to the hospital for a urinary tract infection, and the attending physicians discovered that he was having what he described as a heart attack. (Id. at 131–32.) Since then, he has experienced shortness of breath, dizziness, and chest pains. (Id. at 131.) He stated that he was taking medications — Lisinopril, Klonopin, Cardevil, Pravastin, and aspirin — which helped to control his blood pressure but that his blood pressure still ran high during periods of stress. (Id. at 133.)

The Plaintiff also stated that he had symptoms related to his back stemming from a 2003 automobile injury. (Id. at 138–139.) In 2012, the Plaintiff went to see an orthopedist because he was experiencing symptoms in his back, and according to him, an MRI revealed that he had "arthritis, a spur[,] . . . . and aggressive degenerative disk disease." (Id. at 166.) He was prescribed muscle relaxers and physical therapy; however, he could not go to physical therapy because he could not afford it. (Id. at 143.) As a result of his back condition, the Plaintiff testified that he could not lift anything heavy, push, or bend down. (Id.)

With regard to his daily activities, the Plaintiff testified that he had trouble getting dressed because he could not bend over, *see id.* at 144; he had difficulty sleeping at night due to the pain in his back, *see id.* at 147; he had difficulty concentrating or reading, *see id.* at 149; he could not cook, clean, or do laundry because he could not stand for more than twenty minutes at a time, though he later testified that he sometimes tried to cook for himself, *see id.* at 151–52, 171; he could not drive because the medication he was taking made him drowsy, *see id.* at 177–178; and he occasionally went food shopping with his wife and travelled to New Jersey to visit friends, *see id.* at 152–53.

**C. The Relevant Medical Evidence**

As will be described in more detail below, the focus of this appeal is the Plaintiff's allegedly disabling heart and back conditions. Accordingly, the Court will briefly detail the relevant medical data with respect to those conditions. The Court notes that in its view, Dr. Lin's treatments notes are not legible and therefore, the Court does not include them for purposes of this summary. Nor does the Court include records which post-dated the December 11, 2013 Order and were therefore, not before the ALJ.

**1. The Plaintiff's Heart Impairment**

On May 2, 2011, the Plaintiff was admitted at Brookhaven Memorial Hospital ("Brookhaven") because he was experiencing pain while urinating, "dysuria," and a fever. (Id. at 393.) Dr. Samir Brute, M.D., performed a physical exam on the Plaintiff and noted that his blood pressure was 103/66, and his heart rate was 90 beats per minute. (Id. at 393–94.) He was diagnosed with a urinary tract infection, sepsis, and hypertension. (Id. at 396.) On May 7, 2011, he was discharged from the hospital. (Id.)

On May 17, 2011, the Plaintiff returned to the emergency room at Brookhaven due to tightness in his chest and an abnormal Electrocardiogram ("EKG"). (Id. at 431.) On May 18, 2011, the Plaintiff was transferred from Brookhaven to Stony Brook University Hospital ("Stony Brook") to undergo a Cardiovascular Catheterization Procedure. (Id. at 455.) Dr. Allen Jeremias, M.D., the cardiologist who performed the procedure, diagnosed the Plaintiff with non-obstructive coronary artery disease. (Id. at 457–58.) In addition, Dr. Jordan Katz, M.D., an attending cardiologist, also performed an EKG on the Plaintiff and diagnosed him with "decreased left ventricular cavity size" and "mildly increased left ventricular systolic function." (Id. at 463.)

On May 28, 2011, Dr. Andrew Zaw Lin, M.D., an internist, who had seen the Plaintiff on three previous occasions during the Relevant Period, completed a disability report in which he indicated that the Plaintiff had the following functional limitations in light of his cardiac conditions: he could only

lift ten pounds or less; he could only stand or walk for two hours or less per day; and he could sit for a period of up to six hours per day.  (Id. at 532.)  In addition, Dr. Lin listed the Plaintiff as having normal sensory, mental, and environmental functioning.  (Id.)

On June 29, 2011, Dr. Jeremias performed a follow-up cardiovascular exam on the Plaintiff.  (Id. at 553.)  At the exam, the Plaintiff reported "no chest or shortness of breath."  (Id. at 552.)  After conducting a physical exam and reviewing the Plaintiff's prior medical records, Dr. Jeremias concluded that the Plaintiff has "poorly controlled hypertension with evidence of mild LVH on echocardiogram, who had a recent cardiac catheterization for chest pain that shows minimal coronary atherosclerosis."  (Id. at 553.)  Dr. Jeremias prescribed Pravastatin, Amlodipine, and Coreg for the Plaintiff.  (Id.)

On August 3, 2011, Dr. Joseph Chernilas, M.D., also a cardiologist, performed a follow-up exam on the Plaintiff.  (Id. at 555.)  The Plaintiff reported "postural lightheadedness" and "occasional transient shortness of breath on exertion."  (Id. at 555.)  In his report documenting the visit, Dr. Chernilas stated:

> This is a fifty-one year-old gentlemen with hypertension, hyperlipidemia, nonobstructive coronary artery disease with preserved LV function and no significant valvular pathology with improved blood pressure control, but has symptoms of mild volume depletion, therefore, the combination of lisinopril and hydrochlorothiazide will be converted to just lisinopril 20 mg once per day.  All of the other medications will be continued.

(Id. at 555.)

On August 16, 2011, R. Reynolds, M.D., a medical consultant for the New York State Office of Temporary and Disability Agency, reviewed the Plaintiff's medical records and filled out a form assessing the Plaintiff's residual functional capacity.  (Id. at 476–82.)  Dr. Reynolds found that the Plaintiff had the residual functional capacity to perform "medium work," which consisted of occasionally lifting fifty pounds; frequently lifting twenty-five pounds; pushing and pulling with some limitations in his upper extremities; and sitting for up to six hours in an eight-hour workday.  (Id. at 477.)  Dr. Reynolds based this assessment on the report by Dr. Jeremias of the May 17, 2011

Cardiovascular Catheterization Procedure and the May 18, 2011 EKG conducted by Dr. Katz. (Id. at 477.)

On February 15, 2012, the Plaintiff saw Dr. Ernest Raeder, M.D., a cardiologist, for a follow-up exam. (Id. at 559–60.) In a report of the visit, Dr. Raeder indicated that the Plaintiff had no symptoms. (Id. at 560.)

On April 18, 2012, Plaintiff saw Dr. Jeremias for another follow-up exam. The Plaintiff reported pain in his thighs, a rapid heartbeat, palpitations, shortness of breath, numbness, dizziness, and anxiety and depression. (Id. at 569.) Dr. Jeremias performed a physical exam on the Plaintiff which indicated normal cardiovascular and respiratory functioning. (Id. at 571.) He further noted that the Plaintiff had asked him to fill out a disability form but that there was "no criteria for disability at this time." (Id. at 572.)

On August 21, 2012, Dr. Lin completed a Cardiac Impairment Questionnaire in which he opined that due to the Plaintiff's heart conditions, he was limited to, among other things, sitting up to four hours per day; standing or walking up to two hours per day; occasionally lifting five to twenty pounds; and jobs requiring low stress and no pushing, pulling, kneeling, bending, or stooping. (Id. at 601–02.)

On January 12, 2013, the Plaintiff was admitted at Stony Brook due to increased blood pressure, flutters in his chest, and facial twitching. (Id. at 607.) An MRI showed "no acute cardiopulmonary process" and a physical exam showed a normal heart rate and a "good pulse equal in all extremities." (Id.) On January 13, 2013, the Plaintiff indicated that his symptoms had abated, and he was discharged from the hospital. (Id. at 615, 617.)

On March 29, 2013, Dr. Kathleen Stergiopoulous, M.D., a cardiologist, performed a stress test on the Plaintiff during which the Plaintiff exercised on a tread-mill for eight minutes while Dr. Stergiopoulous monitored his heart functioning. (See id. at 632–33.) In a final report of the test, Dr. Stergiopoulous stated that the Plaintiff exhibited "adequate exercise performance" and did not

experience chest pain while exercising.  (Id. at 633.)  In addition, images taken of his heart after exercising showed that the Plaintiff had "normal global and regional left ventricular function" and no "significant electrocardiographic ST segment changes."  (Id.)

On October 16, 2013, Dr. Mark L. Meyer, M.D., another cardiologist, performed a physical evaluation of the Plaintiff.  (Id. at 669.)  In his report, Dr. Meyer concluded:

> It is my impression that this patient has no active symptoms related to obstructive coronary artery disease.  He has non-obstructive coronary artery disease on his catheterization from 2011, was ruled out for myocardial infarction in January 2013, and in March 2013 he had a normal nuclear stress test.  He does indeed have symptoms of shortness of breath and intermittent chest discomfort.

(Id. at 670.)

In conjunction with his report, Dr. Meyer also filled out a Cardiac Impairment Questionnaire, which indicated that the Plaintiff was limited to sitting and standing for up to one hour per day; could occasionally lift or carry objects of ten to twenty pounds and frequently lift or carry objects weighing up to ten pounds; and was limited to jobs involving low stress and no pushing, pulling, kneeling, bending, or stooping.  (Id. at 667.)

**2. The Plaintiff's Back Impairment**

On November 3, 2005, Dr. Benson Ong Hai, M.D., an orthopedist, examined the Plaintiff, who complained of neck and back pain resulting from a 2003 car accident.  (Id. at 535.)  He noted that an X-Ray of the Plaintiff's lumbar spine was "unremarkable"; there was "normal disc space and alignment"; and there was "no evidence of spondylolisthesis or fracture."  (Id. at 536.)

On November 23, 2005, Dr. Bruce Chernofsky, M.D., a radiologist, took an MRI of the Plaintiff's back, which revealed a "tiny shallow central disc herniation at L4–L5" and "no significant central canal stenosis."  (Id. at 538.)

On May 15, 2012, the Plaintiff went to see Dr. Ong Hai for the first time in more than seven years because he was experiencing pain in his lower back area and numbness in his left leg.  (Id.)  In his report of the visit, Dr. Ong Hai indicated, among other things, that the Plaintiff walked without

difficulty, had full flexion and extension in his cervical spine, and had full strength in his muscles.  (Id. at 541–42.)  He stated that an X-Ray of the Plaintiff's cervical and lumbar spine showed "normal alignment"; "no evidence of disk space narrowing"; and evidence of "some bone spurs . . . at the L1–L2 level."  (Id. at 542.)

On May 31, 2012, Dr. Steven West, M.D., a radiologist, analyzed an MRI of the Plaintiff's back and found "slight interval progression in [the] degree of degenerative disc disease.  No significant spinal stenosis.  Tiny central disc herniation at L4-L5.  No evidence of cauda equine or nerve root compression."  (Id. at 576.)

On June 7, 2012, Dr. Ong Hai also reviewed the Plaintiff's MRI and described it as "unremarkable."  (Id. at 580.)  However, he noted that the MRI showed "evidence of disk degeneration with a disk herniation at the L3–L4 level with evidence of moderate neural foraminal stenosis on the left side."  (Id.)  He prescribed the Plaintiff a "single axis cane" and stated that he would refer the Plaintiff to physical therapy if and when he obtained social security disability benefits.  (Id. at 581.)

On August 16, 2012, Dr. Ong Hai filled out a disability questionnaire based on his three examinations of the Plaintiff on November 3, 2005; May 15, 2012; and June 7, 2012.  (Id. at 590.)  He estimated that the Plaintiff had the residual functional capacity to sit for up to three hours; stand or walk for up to two hours; occasionally lift 10 to 20 pounds; frequently lift 5 to 10 pounds; and reach, handle, and finger without limitation.  (Id. at 593–94.)  He also stated that the Plaintiff could not work at a job that required him to push, pull, kneel, bend, or stoop; the Plaintiff's symptoms were likely to increase if the Plaintiff were placed in a competitive work environment and would interfere with the Plaintiff's ability to work at a desk; the Plaintiff could not perform a full time competitive job that required him to perform activity on a sustained basis; and the Plaintiff was capable of tolerating low work stress.  (Id. at 593–596.)

## D. The Procedural History

On June 16, 2011, the Plaintiff filed an application for disability insurance benefits, alleging that since May 2, 2011, he was disabled within the meaning of the Act due to cardiovascular disorders, a digestive disorder, hypertensive cardiovascular disease, hypertension, and hemorrhoids. (Id. at 182, 308.)

On August 17, 2011, the Social Security Administration ("SSA") denied the Plaintiff's application. On September 20, 2011, the Plaintiff requested a hearing before an administrative law judge.

On June 6, 2012, the Plaintiff appeared before the ALJ for a hearing with his then-attorney Patrick Busse, Esq. ("Busse"). (Id. at 186.)

On June 26, 2012, the ALJ issued a written decision finding that the Plaintiff was not disabled within the meaning of the Act through the date of last insured, which he stated was December 31, 2005 (the "June 26, 2012 Order"). (Id. at 192.)

On July 12, 2013, the SSA Appeals Council vacated the June 26, 2012 Order and remanded the case because (i) the ALJ incorrectly stated that the date of the Plaintiff's last insured was December 31, 2005, well before the alleged onset date of his disability; (ii) failed to address what effects, if any, the Plaintiff's obesity had on his ability to perform his past work; and (iii) failed to give proper consideration to the Plaintiff's maximum residual functional capacity and provide an appropriate rationale for his conclusion with specific references to evidence in the record supporting the assessed limitations. (Id. at 197–98.) In addition, the Appeals Council noted that on remand, the ALJ should if necessary, obtain additional evidence from a medical expert to clarify the nature of the Plaintiff's impairments and a vocational expert to clarify the effects of the assessed limitations on the Plaintiff's ability to perform other work in the national economy. (Id. at 197–98.)

On November 21, 2013, the Plaintiff appeared for a second hearing before the ALJ, again represented by Busse. (Id. at 158.)

On December 11, 2013, the ALJ issued a second written decision finding that from May 2, 2011, the alleged onset of the Plaintiff's disability, to December 31, 2015, the date he last met the insurance requirements of the Act, the Plaintiff was not disabled within the meaning of the Act (the "December 11, 2013 Order"). (<u>Id.</u> at 95–104.)

On January 23, 2014, the Plaintiff appealed the December 11, 2013 Order to the SSA Appeals Council. (<u>Id.</u> at 91–92.) In support of his application, the Plaintiff submitted additional medical records. (<u>See id.</u> at 1–2.)

On October 29, 2014, the SSA Appeals Council denied the Plaintiff's request for an appeal, rendering the December 11, 2013 Order the final decision of the Commissioner. (<u>Id.</u> at 2.) In so doing, the Appeals Council noted that that additional medical records submitted by the Plaintiff were dated after December 11, 2013. (<u>Id.</u> at 2.) Since the ALJ's decision was for the period up to December 11, 2013, the Appeals Council found that the new information did "not affect the decision about whether [the Plaintiff] [was] disabled beginning on or before December 11, 2013." (<u>Id.</u> at 2.)

On December 24, 2014, the Plaintiff timely commenced this action seeking to vacate the Commissioner's decision because he contended that the December 11, 2013 Order was contrary to law and not supported by the substantial evidence.

The Court will now address the applicable standard of review and each of the Plaintiff's claims on this appeal.

## II. DISCUSSION

### A. As to the Standard of Review

"'A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error.'" <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008) (quoting <u>Shaw v. Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000)).

Under this standard, judicial review of the Commissioner's final decision requires "two levels of inquiry." Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987). The district court "first reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).

Next, the Court examines the administrative record to "'determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision[.]'" Burgess, 537 F.3d at 128 (quoting Shaw, 221 F.3d at 131). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (quoting Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004)). "It is . . . a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Com'r, 683 F.3d 443, 448 (2d Cir. 2012). In other words, "once an ALJ finds facts, [a district court] can reject those facts 'only if a reasonable factfinder *would have to conclude otherwise*.'" Id. (emphasis in original) (quoting Warren v. Shalala, 29 F.3d 1287, 1290 (8th Cir. 1994)). Thus, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)).

## B. As to the Relevant Statutory and Regulatory Framework

To qualify for disability insurance benefits under the Act, an individual must (i) be "insured for disability benefits;" (ii) not have attained retirement age; (iii) be a U.S. citizen or a foreign national under certain circumstances not relevant here; (iv) have filed an application for disability insurance benefits; and (v) have a "disability." 42 U.S.C. § 423(a)(1).

The Act defines "disability" to mean "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In addition, the impairment must be "of such severity that [the

claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

The SSA regulations set forth a five-step sequential evaluation process for determining whether a claimant's impairment meets the definition of "disability." See 20 C.F.R. § 404.1520. The Second Circuit has implemented that procedure as follows:

> (i) "[T]he [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity";
> (ii) "If he is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities";
> (iii) "If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations";
> (iv) "If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work"; and
> (v) "Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)).

"The claimant generally bears the burden of proving that she is disabled under the statute, but 'if the claimant shows that [her] impairment renders [her] unable to perform [her] past work, the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform.'" Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) (alterations in original) (quoting Carroll v. Secretary of Health and Human Services, 705 F.2d 638, 642 (2d Cir. 1983)).

## C. As to the December 11, 2013 Order

As noted, following a second hearing on remand, on December 11, 2013, the ALJ ruled that the Plaintiff was not disabled within the meaning of the Act. (SSA Rec. at 104.)

In so doing, he applied the correct five-step framework described above. Specifically, he first determined that that the Plaintiff met the relevant insurance requirements under the Act through December 31, 2015. (Id. at 97.) Thus, according to the ALJ, the Plaintiff had to demonstrate that he suffered from a disability during the period May 2, 2011, the date when he alleged that his disability began, to December 31, 2015, the date when he last met the insurance requirements under the Act (the "Relevant Period"). (See id.)

Proceeding to the five-step regulatory framework, the ALJ determined that during the Relevant Period, the Plaintiff had the following "severe impairments": "hypertension and degenerative disc disease of the lumbosacral spine." (Id.) The ALJ noted that the record indicated that the Plaintiff was overweight and suffered from hemorrhoids and nonobstructive coronary artery disease. (Id.) However, in the ALJ's view, the "evidence [did] not establish that these impairments significantly limit[ed] [the Plaintiff's] ability to engage in work related activities." (Id.) Accordingly, the ALJ did not consider the Plaintiff's weight, hemorrhoids, or non-obstructive coronary artery disease as disabling conditions and instead focused the disability analysis on his diagnoses of hypertension and degenerative disc disease.

Next, the ALJ found that the Plaintiff's severe impairments did not "meet[]" or "medically equal" the listed impairments in Appendix 1, 20 C.F.R. § Pt. 404, Subpt. P, App. 1, which constitute *per se* disabling conditions. (Id. at 98.)

At step 4 of the framework, the ALJ first determined that the Plaintiff had the residual functional capacity ("RFC") to perform the full range of light work, which requires "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds"; "a good deal of walking or standing"; and when it involves a good deal of sitting, also requires "some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

In support of this conclusion, the ALJ relied on the opinions of Dr. Reynolds, a New York State Medical Consultant, and Dr. Jeremias, one of the Plaintiff's treating cardiologists, as well as the

objective medical evidence.  (Id. at 103.)  The ALJ also gave little weight to RFC assessments completed by Dr. Lin, the Plaintiff's treating internist, Dr. Meyer, an examining cardiologist, and Dr. Ong Hai, the Plaintiff's treating orthopedist, all of which suggested that the Plaintiff would be unable to perform the functions associated with "light work." (Id. at 102–03.)

Finally, the ALJ considered the Plaintiff's testimony regarding his symptoms and found that although the Plaintiff's back and heart impairments "could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible."  (Id. at 99.)

For these reasons, the ALJ concluded that the Plaintiff had the RFC to perform "light work" and therefore, could perform his prior work as a computer database manager, which he described as "sedentary in exertional nature" in that it only required the Plaintiff to "walk for two hours, stand for two hours, . . . sit for up to ten hours [per] workday[, and] . . . . lift a maximum of 10 pounds frequently"  (Id.)

Accordingly, at step 4 of the regulatory framework, the ALJ found that the Plaintiffs was not disabled within the meaning of the Act and did not proceed to step five.

## D. As to the Treating Physician Rule

On appeal, the Plaintiff first challenges the ALJ's determination that the Plaintiff had the RFC to perform "light work" because he contends that (i) the ALJ erred in not affording controlling weight to the opinions of Drs. Lin, Meyer, and Ong Hai; and (ii) the ALJ erred in placing great weight on the opinions of Dr. Jeremias, one of the Plaintiff's treating cardiologists, and the opinion of Dr. Reynolds, a State Medical Consultant. (See the Pl.'s Mem. of Law at 11–16.)

In reply, the Commissioner asserts that (i) the ALJ correctly concluded that the opinion of Drs. Lin, Meyer, and Ong Hai were not supported by the substantial evidence; and (ii) the ALJ properly placed significant weight on the opinions of Drs. Jeremias and Reynolds.  (See the Commn'r's Reply Mem. of Law at 1–6.)  The Court agrees.

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis," meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." Titles II & Xvi: <u>Assessing Residual Functional Capacity in Initial Claims</u>, SSR 96-8P (S.S.A. July 2, 1996); <u>see also</u> <u>Cichocki v. Astrue</u>, 729 F.3d 172, 176 (2d Cir. 2013) (same). The ALJ must assess an individual's RFC "based on all the evidence in [the claimant's] case record," including statements from the claimant and all of the "relevant medical and other evidence." 20 C.F.R. § 404.1545(a); <u>see also</u> <u>Petersen v. Astrue</u>, 2 F. Supp. 3d 223, 233 (N.D.N.Y. 2012) ("When making a residual functional capacity determination, the ALJ considers a claimant's physical abilities, mental abilities, and symptomatology, including pain and other limitations that could interfere with work activities on a regular and continuing basis.") (citing 20 C.F.R. § 404.1545(a)).

Under the so-called "treating physician" rule a treating source's opinion on the nature and severity of a claimant's symptoms is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); <u>see also</u> <u>Selian v. Astrue</u>, 708 F.3d 409, 418 (2d Cir. 2013) (Per Curiam) ("The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record.") (citing <u>Burgess</u>, 537 F.3d at 128).

If an ALJ decides not to give controlling weight to a treating source's opinion, the SSA regulations require that an ALJ give "good reasons" according to certain factors, including:

> the '[l]ength of the treatment relationship and the frequency of examination'; the '[n]ature and extent of the treatment relationship'; the 'relevant evidence . . . , particularly medical signs and laboratory findings,' supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues.

<u>Burgess</u>, 537 F.3d at 129 (alterations in original) (quoting 20 C.F.R. § 404.1527(d)(2)(i)–(ii), (3)–(5)).

However, the Second Circuit has stopped short of requiring that ALJs explicitly consider each one of these factors; rather, it has affirmed the decisions of ALJs so long as they apply the "substance of the treating physician's rule" and provide "good reasons" for not according a treating physician's opinion controlling weight. See Halloran, 362 F.3d at 33 (affirming an ALJ's decision to disregard a treating physician's opinion because it "applied the substance of the treating physician rule," though it warned in *dicta* that it "would not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians opinion"); see also Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) ("Finally, Atwater challenges the ALJ's failure to review explicitly each factor provided in 20 C.F.R. § 404.1527(c). We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."); Taylor v. Colvin, No. 3:14-CV-0928 (GTS), 2016 WL 1049000, at *4 (N.D.N.Y. Mar. 11, 2016) ("'Where, as here, an ALJ's reasoning and adherence to the regulations are clear, the ALJ is not required to review explicitly each and every factor of the regulation.'") (citing Atwater, 512 F. App'x at 70); Hollaway v. Colvin, No. 14CIV5165 (RAH) (BP), 2016 WL 96172, at *11 (S.D.N.Y. Jan. 8, 2016), report and recommendation adopted, No. 14-CV-5165 (RA), 2016 WL 1275658 (S.D.N.Y. Mar. 31, 2016) (same).

Here, the ALJ did not explicitly refer to each of the factors set forth in the SSA regulations — namely, the length of the treatment relationship; the relevant evidence supporting the medical opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issue — when disregarding the RFC assessments of Drs. Lin, Meyer, and Ong Hai. However, he did implicitly refer to some of the factors and provide what the Court finds to be "good reasons" supported by substantial evidence in reaching his determination with respect to each of the physicians. The Court will now address the propriety of the ALJ's conclusion with respect to each physician.

### 1. Dr. Lin's RFC Assessment

With regard to Dr. Lin, the Plaintiff's treating internist, the ALJ noted that Dr. Lin had examined the Plaintiff on "numerous" occasions but found that his August 20, 2012 RFC assessment indicating that the Plaintiff could not perform the duties associated with "light work" was "not supported by the objective medical evidence, including his own examination findings, which were largely unremarkable." (SSA Rec. at 103.)

Although the ALJ did not refer to the treating physician rule specifically or the factors specified in the SSA regulations, he did apply the substance of the rule by explaining what weight he was giving to Dr. Lin's opinion and the reason for why he was not affording it controlling weight — namely, it was not supported by the objective medical evidence. As the cases discussed above demonstrate, that is all that is required in this Circuit. See Galatro v. Colvin, No. 14-CV-5284 (JS), 2016 WL 1254330, at *7 (E.D.N.Y. Mar. 29, 2016) ("[T]he Second Circuit has made clear that the ALJ need not produce a 'slavish recitation of each and every factor [set forth in 20 C.F.R. § 404.1527(c)] where the ALJ's reasoning and adherence to the regulation are clear.'") (quoting Astrue, 512 F. App'x at 70).

Further, the Court finds that substantial evidence supports the ALJ's conclusion that the Dr. Lin's RFC assessment is not consistent with the objective medical evidence in the record. In the August 2012 RFC Assessment, Dr. Lin checked off boxes indicating that the Plaintiff's heart condition limited him to sitting for four to six hours; standing for two hours; and occasionally lifting objects up to twenty pounds. (Id. at 601–602.) The only evidence he cited in support of his opinion was the May 17, 2011 Cardiovascular Catheterization Procedure conducted at Stony Brook, which revealed that the Plaintiff had "non-obstructive coronary artery disease" and "normal left ventricular function[.]" (Id. at 457–58.)

However, as the ALJ noted elsewhere in the December 11, 2013 Order, see id. at 97, 103, the physical examinations and tests conducted on the Plaintiff during the Relevant Period consistently showed that his "non-obstructive coronary disease" did not affect his ability to sit, stand, or walk in a

meaningful way. In particular, a March 29, 2013 report of a stress test administered on the Plaintiff by Dr. Stergiopoulous stated that Plaintiff was able to exercise adequately for eight minutes without chest pain and that images taken of his chest following the test showed "normal global and regional left ventricular function"; no "perfusion abnormalities"; and a "normal hemodynamic response to exercise." (Id. at 633.) Similarly, Dr. Meyer, a consultative cardiologist, noted after performing a physical exam on the Plaintiff, that he had "no active symptoms related to obstructive coronary artery disease." (Id. at 670.) Other physical exams conducted by the Plaintiff's doctors at Stony Brook during the Relevant Period showed no impairments; described his heart condition as "mild"; and noted that the Plaintiff had a normal heart rate and pulse. (See id. at 553, 562, 570.)

The Plaintiff does not point to any objective medical test results which the ALJ overlooked, and instead relies primarily on the Plaintiff's own subjective complaints, which do not, by themselves, provide the kind objective medical support required to trigger automatic deference under the treating physician's rule. See 20 C.F.R. § 416.927(c)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.") (emphasis added); see also Baladi v. Barnhart, 33 F. App'x 562, 564 (2d Cir. 2002) (Summary Order) ("The treating physician's opinions were based upon plaintiff's subjective complaints of pain and unremarkable objective tests, and therefore the ALJ was not required to give that opinion controlling weight[.]").

Accordingly, the Court finds substantial evidence supports the ALJ's decision to disregard the more onerous limitations on the Plaintiff's RFC set forth in Dr. Lin's August 20, 2012 Assessment.

## 2. Dr. Meyer's RFC Assessment

Similarly, the ALJ disregarded an RFC assessment completed by Dr. Meyer, a cardiologist, in which he indicated that the Plaintiff's heart condition limited him to sitting for one hour per day;

standing or walking for one hour per day; occasionally lifting objects weighing up to twenty pounds; and frequently lifting objects weighing up to ten pounds. (SSA Rec. at 665–66.)

The ALJ gave limited weight to this assessment because Dr. Meyer "examined the [Plaintiff] only once and his opinion regarding the [Plaintiff's] residual functional capacity was not supported by the record, including his own examination physical findings, which were unremarkable, as well as his own conclusion that the [Plaintiff] had no active symptoms related to obstructive coronary artery disease." (Id. at 102.)

The Plaintiff asserts that the ALJ should have given Dr. Meyer's assessment significant weight because in his assessment, Dr. Meyer stated that his opinions were based on the May 17, 2011 Cardiovascular Catheterization Procedure, the March 29, 2013 Stress Test, and positive clinical findings of shortness of breath and fatigue. (See the Pl.'s Mem. of Law at 15.) Again, the Court disagrees.

As the already discussed, the Cardiovascular Catheterization Test revealed "non-obstructive coronary artery disease" but did not indicate the severity of that impairment and subsequent records, including the March 29, 2013 stress test, suggest that the Plaintiff's heart functioned without a problem.

Furthermore, as the ALJ correctly noted, Dr. Meyer's report of his physical exam of the Plaintiff and review of the Plaintiff's medical records appears to be at odds with his RFC assessment. Specifically, he stated

> It is my impression that this patient has no active symptoms related to the obstructive coronary artery disease. He has non-obstructive coronary artery disease on his catheterization from 2011, was ruled out for myocardial infarction in January 2013, and in March 2013 he had a normal nuclear stress test. He does indeed have symptoms of shortness of breath and intermittent chest discomfort.

(Id. at 670.)

The fact that Dr. Meyer found "no active symptoms" and described the results of the Plaintiff's catheterization and stress test as "normal" undermines a conclusion that the Plaintiff's RFC was significantly limited by his heart condition.

Therefore, in light of the objective medical records, the Court finds that substantial evidence supports the ALJ's decision to place limited weight on Dr. Meyer's RFC assessment. See Shaffer v. Colvin, No. 1:14-CV-00745 (MAT), 2015 WL 9307349, at *4 (W.D.N.Y. Dec. 21, 2015) ("As the above summary reveals, plaintiff's treatment records as well as imaging tests and Dr. Miller's consulting opinion constitutes substantial evidence contradicting Dr. Singh's extremely restrictive functional assessment."); Johnston v. Colvin, No. 3:13-CV-00073 (JCH), 2014 WL 1304715, at *30 (D. Conn. Mar. 31, 2014) ("[T]he Court finds that the ALJ did not err in failing to assign controlling weight to Dr. Schwarz's opinion because it is not supported by the objective medical evidence and is inconsistent with other medical evidence of record, including other clinical examinations.").

### 3. Dr. Ong Hai's Assessment

On August 16, 2012, Dr. Ong Hai, an orthopedist, also filled out an RFC assessment based on three prior physical examinations of the Plaintiff on November 3, 2005; May 15, 2012; and June 7, 2012. (SSA Rec. at 590.) In the assessment, he checked the boxes indicating that in a single eight-hour workday, the Plaintiff is limited to sitting for three hours and standing or waking for two hours; occasionally lifting objects weighing up to 20 pounds and frequently lifting objects weighing up to 10 pounds. (Id. at 593–594) He also noted that the Plaintiff's symptoms would interfere with his ability to work at a desk and would worsen with stress. (Id. at 594–95.)

The ALJ placed limited weight on Dr. Ong Hai's RFC assessment because Dr. Ong Hai "first examined the [Plaintiff] in 2005, but did not examine the Plaintiff again until May 2012" and "examined the [Plaintiff] only once more before he rendered his opinion regarding the [Plaintiff's] residual functional capacity." (Id. at 103.) In addition, the ALJ found that Dr. Ong Hai's opinion was

"not supported by the medical record, which consistently shows minimal positive findings relating to the [Plaintiff's] back."  (Id. at 103.)

On appeal, the Plaintiff asserts that the ALJ "mischaracterized the record by finding the opinions from a treating board certified physiatrist Dr. Ong [H]ai unsupported by any clinical or objective findings related to the Plaintiff's back pain."  (The Pl.'s Mem. of Law at 13.) The Court finds this objection to be without merit.

As with Dr. Lin, although the ALJ did not explicitly cite to the treating physician rule, he applied the substance of that rule by considering the length of the treatment relationship and the relevant medical evidence in the record as a whole.  Thus, there was nothing legally improper in the ALJ's analysis.

Furthermore, the Court finds that substantial evidence supports the ALJ's conclusion that the medical records relating to the Plaintiff's back showed "minimal positive" findings and were therefore, inconsistent with Dr. Ong Hai's opinion.

The Plaintiff originally injured his back in 2003 in a car accident.  An MRI taken of the Plaintiff's spine on November 23, 2005, two years after the injury, showed a "tiny central disc herniation minimally indenting the thecal sac. There is no significant central or neural canal stenosis." (Id. at 538.)  Thus, the original injuries appeared to be relatively minor.  Further, despite the Plaintiff's injuries to his spine, he was able to return to work as an Assistant Manager at an auto repair store for five years, a job that he described as requiring him to stand for eight hours per day and frequently lift cases of oil and anti-freeze weighing upwards of fifty pounds.  (Id. at 336.)

In addition, the medical records during the Relevant Period, do not support the Plaintiff's contention that his condition worsened to the point where he could not perform "light work" in the five months after he was laid off from his job at the auto repair store.  Specifically, a May 15, 2012 X-Ray showed "normal alignment" of the Plaintiff's cervical and lumbar spine and "no evidence of disc narrowing."  (Id. at 542.)  While there was some evidence of "bone spurs" in the Plaintiff's lumbar

spine at the L1-L2 level, the Plaintiff showed minimal limitations during his physical — he walked with a normal gait and without difficulty, had full muscle strength, full flexion in his cervical spine, and equal reflexes.  (Id. at 541–42.)  In addition, a May 31, 2012 MRI showed a "slight interval progression in [the] degree of degenerative disc disease.  No significant spinal stenosis.  Tiny central disc herniation at L4-L5.  No evidence of cauda equina or nerve root compression."  (Id. at 576) (emphasis added).

Based on this evidence, the Court finds that substantial evidence supports the ALJ's conclusion that Dr. Ong Hai's restrictive RFC assessment did not square with the objective evidence in the record and therefore, was not entitled to substantial weight.

### 4. The Opinion of Dr. Jeremias

The Plaintiff also objects to the ALJ's use of an opinion by Dr. Jeremias, the Plaintiff's treating cardiologist.

In treatment notes from an April 18, 2012 physical exam that he performed on the Plaintiff, Dr. Jeremias stated that the Plaintiff asked him to fill out a disability form but that there was "no criteria for disability at this time."  (SSA Rec. at 572.)  In the December 11, 2013 Order, the ALJ found that the Plaintiff's "cardiac findings have been much more consistent with the opinion of Dr. Jeremias who concluded that the claimant had no criteria for disability."  (Id. at 103.)

The Plaintiff asserts that the ALJ should not have drawn a negative inference from Dr. Jeremias's "vague and conclusory statement" because "[i]t is unclear if Dr. Jeremias [sic] 'criteria' of disability is the same as the Administration's [sic] definition of disability."  (The Pl.'s Mem. of Law at 13.)

The Plaintiff is correct that under the SSA regulations, the ALJ is "responsible for making the determination or decision about whether [a claimant] meet[s] the statutory definition of disability," and therefore, a "statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the ALJ] will determine that [a claimant] is disabled."  20 C.F.R. § 404.1527(d)(1).  Thus,

an opinion that a claimant is "not disabled," *by itself*, is not entitled to controlling weight. Rather, the ALJ must look to "all of the medical findings and other evidence that support a medical source's statement," in determining whether a claimant meets the definition of a disability. Id.; see also Westcott v. Colvin, No. 12-CV-4183 (FB), 2013 WL 5465609, at *3 (E.D.N.Y. Oct. 1, 2013) ("[T]he assessments by both doctors of Westcott's ultimate disability status are not entitled to controlling weight because the treating physician rule does not govern issues reserved to the Commissioner.").

However, in this case, the ALJ did not give Dr. Jeremias's apparent opinion that the Plaintiff was not disabled controlling weight, as the Plaintiff contends. To the contrary, he merely noted that the opinion was consistent with the "cardiac findings" in the record, which as described earlier, suggest that the Plaintiff did not have any significant limitations to his RFC. Therefore, the Court sees no legal error in the ALJ's conclusion that Dr. Jeremias's opinion was consistent with the objective medical evidence.

### 5. The Opinion of Dr. Reynolds

On August 16, 2011, Dr. Reynolds, a State Medical Consultant, reviewed the Plaintiff's medical file and concluded that the Plaintiff had the RFC to perform a full range of medium or light work, including siting and walking for up to six hours of an eight hour day; occasionally lifting objects weighing fifty pounds; and frequently lifting objects weighing twenty-five pounds. (See SSA Rec. at 482.)

In the December 11, 2013 Order, the ALJ concluded, "Although Dr. Reynolds never had the opportunity to personally examine the claimant, his opinion is well supported by the objective medical evidence. Therefore, the opinion of Dr. Reynolds was given great weight." (Id. at 103.)

The Plaintiff asserts that the ALJ erred in giving Dr. Reynolds' opinion great weight because "[t]he opinions from non-examining consultants are generally entitled to the least weight." (The Pl.'s Mem. of Law at 13.) Further, he asserts that the Dr. Reynolds issued his opinion in 2011 and

therefore, his assessment did not include the full range of relevant medical records. (See id.) Again, the Court finds the Plaintiff's objection to be without merit.

The SSA regulations state although they are not bound by the findings made by a state agency medical consultants, the ALJ must consider their opinions and give weight to them according to the same factors relevant to treating physicians, "such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical . . . consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. §§ 404.1527(e)(2)(i)–(ii); see also Little v. Colvin, No. 5:14-CV-63 MAD, 2015 WL 1399586, at *9 (N.D.N.Y. Mar. 26, 2015) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.") (quoting Cobb v. Comm'r of Soc. Sec., No. 5:13–cv–591, 2014 WL 4437566, *6 (N.D.N.Y. Sept. 9, 2014)); see also Leach ex rel. Murray v. Barnhart, No. 02 CIV.3561 (RWS), 2004 WL 99935, at *9 (S.D.N.Y. Jan. 22, 2004) (same).

Here, the ALJ accorded the opinion of Dr. Reynolds great weight because it was well supported by the objected medical evidence, which as described above clearly supports a determination that the Plaintiff was not significantly inhibited by his heart condition.

Accordingly, here too, the Court finds no error in the ALJ's decision. See Sykes-Abrams v. Colvin, No. 6:14-CV-1085 (GTS), 2015 WL 7313402, at *7 (N.D.N.Y. Nov. 19, 2015) (rejecting an argument that the ALJ erred in placing significant weight on the opinion of a non-examining State agency medical consultant because "[a]n ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants").

**B. As to the Plaintiff's Credibility**

Finally, the Plaintiff asserts that the ALJ failed to properly assess his credibility. (See the Pl.'s Mem. of Law at 16–18.)

It is well-established that "[w]hen determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, . . . . but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier, 606 F.3d at 49 (citing 20 C.F.R. § 416.929) (emphasis added).

In that regard, SSA regulations provide a two-step process for evaluating the credibility of a claimant's assertions of pain. "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged."' Id. (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." Id. (alteration in original) (quoting 20 C.F.R. § 404.1529(a)); see also SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996) ("[O]nce an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.").

Here, the ALJ considered the Plaintiff's symptoms:

The [Plaintiff] alleges disability due to a cardiovascular disorder, a digestive disorder, hypertensive cardiovascular disease, hypertension and hemorrhoids. He testified that as a result of his impairments, he has low back pain, his left leg is weak, and he has palpitations if he exerts himself or walks long distances. [He] also testified that he gets short of breath walking up stairs. In addition, [he] testified that he has difficulty concentrating and that his medications make him foggy and drowsy.

(SSA Rec. at 98.)

The ALJ then applied the proper two step framework for evaluating the Plaintiff's credibility. At the first step, he found that the Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]" (Id. at 99.) However, at the second step, he found that the

Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in the decision." (Id.)

Subsequently, based on his review of the relevant medical evidence and opinions, the ALJ determined that the Plaintiff's complaints related to his heart condition were not entirely credible because "physical examinations have consistently shown minimal findings, and the results of an exercise stress test were normal." (Id. at 103.) He also found that "although the [the Plaintiff] has had complaints of back pain, physical examinations have also revealed minimal findings relating to [the Plaintiff's] back, and MRIs have shown only a tiny herniated disc and some degenerative disease with no evidence of spinal stenosis or nerve root compression." (Id.) Finally, he found that "although the [Plaintiff] testified that his medications make him foggy and drowsy, there is no evidence that he has ever complained of such side effects to his treating physicians. It is reasonable to assume that [if] the [the Plaintiff's] medications were causing significant side effects that he would have mentioned it to his doctors." (Id.)

The Plaintiff alleges that the ALJ's credibility finding was insufficient for three reasons, all of which the Court finds unpersuasive.

First, he asserts that the ALJ erred because the ALJ rejected the Plaintiff's statements about the severity of his symptoms based solely on the objective medical evidence. (See the Pl.'s Mem. of Law at 17.)

The Plaintiff is correct that the SSA regulations provide that an ALJ may not reject a claimant's statements about the intensity and persistence of his or her pain based solely on "objective medical evidence" — meaning evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption. 20 C.F.R. § 404.1529(c)(2). Instead, the SSA regulations describe "[o]bjective medical evidence" as "a useful indicator" but direct an ALJ to consider other factors in evaluating the intensity and persistence of a claimant's symptoms, including:

> (i) the claimant's "daily activities"; (ii) "[t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms"; (iii) "[p]recipitating and aggravating factors"; (iv) "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms"; (v) "[t]reatment, other than medication, you receive or have received for relief of your pain or other symptoms"; (vi) "[a]ny measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)"; and (vii) "[o]ther factors concerning your functional limitations and restrictions due to pain or other symptoms."

Id. at § 404.1529(c)(3) (alterations added).

Although the ALJ did not explicitly consider all of these factors in evaluating the Plaintiff's statements concerning the intensity of his symptoms; the ALJ did consider evidence beyond the medical evidence in the record, including the Plaintiff's own statements; the medications he was taking; and the medical opinions of the Plaintiff's treating and non-treating physicians. Thus, the ALJ did not, as the Plaintiff contends, discount the Plaintiff's statements solely on the basis of the objective medical evidence. See Karoumia v. Colvin, No. 4:13CV04098-JEH, 2015 WL 997225, at *7 (C.D. Ill. Mar. 3, 2015) ("The ALJ here did not find that the Plaintiff was without pain or limitation, nor did she require him to provide objective medical evidence to substantiate the degree of his pain or limitations. Rather, she evaluated the Plaintiff's claims in light of the other evidence in the record which, as noted, provided a basis for doubting the Plaintiff's testimony. While the ALJ cannot require objective medical evidence to prove the degree of pain or limitation, the ALJ is also not required to simply accept at face value the Plaintiff's claims either. She must instead evaluate the Plaintiff's credibility on the issue according to the factors set forth in SSR 96–7p, which she did.").

Second, the Plaintiff asserts that the ALJ committed reversible error by failing to specifically refer to all seven factors set forth in the SSA regulations discussed above and for not providing sufficiently specific reasons for rejecting the Plaintiff's testimony. (See the Pl.'s Mem. of Law at 18.)

However, as the Commissioner correctly points out, the Second Circuit has not required the ALJ to explicitly consider all seven factors set forth in the SSA regulations in evaluating a claimant's credibility. Rather, the Circuit Court has stated, "[W]hile it is 'not sufficient for the [ALJ] to make a

single, conclusory statement that' the claimant is not credible or simply to recite the relevant factors, [SSR 96–7p, 1996 WL 374186, at *2.], remand is not required where 'the evidence of record permits us to glean the rationale of an ALJ's decision[.]'" Cichocki v. Astrue, 534 F. App'x 71, 76 (2d Cir. 2013) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983)); see also Sabater v. Colvin, No. 12CV4594 (KMK)(JCM), 2016 WL 1047080, at *6 (S.D.N.Y. Mar. 10, 2016) ("The ALJ, however, was not obligated to explicitly reconcile each piece of evidence he considered in his decision as long as it is clear, as is the case here, that he weighed all the evidence of Plaintiff s symptoms, both subjective and objective.") (collecting cases).

Here, as noted above, the ALJ did not rely solely on boiler plate language. Rather, he analyzed all of the evidence in the record, including the Plaintiff's own testimony, and provided specific reasons for both his RFC determination and his credibility determination accompanied by references to the evidence which he believed supported his determinations. (See id. at 103.)

Although his analysis and organization is not necessarily a model of clarity, the Court finds the ALJ's reasoning was sufficiently specific to meet the requirements adopted by courts in this Circuit. Furthermore, as discussed earlier, there is ample support in the record for the ALJ's conclusion that the Plaintiff's statements regarding the intensity of his symptoms were not credible.

For these reasons, the Court finds that the the ALJ's credibility assessment to be sufficient under the SSA regulations and supported by substantial evidence in the record. See Cichocki, 534 F. App'x at 76 ("While the ALJ did not discuss all seven factors listed in 20 C.F.R. § 416.929(c)(3), he provided specific reasons for his credibility determination, including that the treatment notes, both from before and after Cichocki's seizure, indicate that her bipolar disorder was managed with medication and did not affect her sleep, appetite, or ability to do chores. Because the ALJ thoroughly explained his credibility determination and the record evidence permits us to glean the rationale of the ALJ's decision, the ALJ's failure to discuss those factors not relevant to his credibility determination does not require remand."); Tricarico v. Colvin, No. 14-CV-2415 (RRM), 2015 WL 5719696, at *13

(E.D.N.Y. Sept. 28, 2015) (rejecting an argument that a case should be remanded because the ALJ failed to cite to the appropriate factors and set out his reasoning with specificity because, according to the court, "[t]he ALJ thoroughly explained his credibility determination and the record evidence permits the Court to glean the rationale of the ALJ's decision. Thus, the ALJ's determination that Tricarico was not entirely credible regarding the intensity, persistence, and limiting effects of his symptoms was supported by substantial evidence in the record.").

### III. CONCLUSION

For the foregoing reasons, the Commissioner's motion for a judgment on the pleading dismissing the complaint is granted; the Plaintiff's cross motion for a judgment on the pleadings is denied; and the Clerk of the Court is directed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
May 23, 2016


_/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge